The next case called, Agenda Numbers 123895 and 124002, Jones et al. v. Pneumo Abex, Owens, Illinois, Agenda Number 6. Mr. Simpson and Mr. Riley, I see you are splitting your time this morning, 10 minutes, 10 minutes, on your opening arguments and a 5-5 on the reply. The clerk will give you a 3-minute warning. You may proceed. Mr. Chief Justice, members of the court, counsel, my name is Reagan Simpson. I will be presenting arguments for Pneumo Apex, usually called Apex in this litigation. The issue in this overall litigation as to Apex can be stated as follows. Is there additional evidence beyond parallel conduct sufficient to create a jury question under the proper standard on whether Apex participated in the alleged conspiracy? The only additional evidence parallel conduct is not publishing 8 or 9 tumors in 11 mice in an extensive article on a different subject, namely asbestosis. The answer to that question is no, and our arguments can be distilled into three points primarily, and they are all summarized in pages 13 through 23 of our reply brief with record sites, although they are not stated in precisely this order. The first point is that the tumors in the 11 mice meant nothing. Dr. Gardner, the researcher, wrote that they obviously meant nothing. The leading cancer doctors at the time at the National Cancer Institute convened a meeting and also determined that the tumors did not mean anything. Dr. Pratt, who was a co-author of the published article on asbestosis, said they were meaningless. So have circuit court judges in this state, including, for example, Judge Lawrence in McLean County, who noted the flaws in the experiment with the 11 mice and said those flaws were impurable. That leads to a simple proposition. Not publishing results that mean nothing does not equate to a conspiracy to hide something. That is essentially the primary opposing of the Fourth District of California in the Redondo case. The second point, I really cannot state any better than Judge Prochaska in Winnebago County when he granted one of our summary judgments in this litigation. He stated that the only evidence that was available to APEX about the tumors in the 11 mice was evidence that would lead APEX to conclude that it was proper not to publish the results. The information it got was in APEX Exhibit 738, a report of a meeting that APEX did not attend. And as Judge Prochaska concluded, for that reason there is no evidence of what McClure requires, namely a voluntary and knowing agreement. Or to state another simple proposition, conduct that you have every reason to believe is proper under the circumstances cannot be evidence of conspiratorial conduct. The third point was also stated very ably by another circuit court judge, Judge Brumman, in Adams County, granted another one of our summary judgments. He looked at the letter that Dr. Hamlin, the medical director of APEX, sent to the meeting he did not attend. Looking at that letter, Judge Brumman concluded that Dr. Hamlin expressed no concern whatsoever about publishing the results of the 11 mice, that the information was already available. Dr. Hamlin said in his letter it was frequently reported in the United States and abroad. And he was too busy to attend the meeting. That concluded, Judge Brumman, was no evidence of entering into a conspiracy. Instead, it was evidence intending to negate any agreement. So for those three points, or reasons, the 11 mice, not publishing the 11 mice, under any standard, is not any evidence of conspiratorial conduct. Even if it could be stretched into some form of circumstantial evidence, combined with parallel conduct, it cannot certainly meet the requirement of clear and convincing evidence in its corollary rule, the innocent construction rule. Is the 11 mice study the only information that was removed from Dr. Gardner's report? Justice Brumman, I believe that that is correct. It was a study that was done about many different experiments over many years on the subject of asbestosis. And it involved many different animals. And it was an extensive publication. And that particular finding on the 11 mice was not published. And Dr. Gardner stated that he did not want it to be published, that he had not intended to study cancer. He intended to conduct a proper experiment, which he asked for funding for from the National Cancer Institute later on. And that he had used tumor-prone mice, mice that naturally develop tumors, are used in research because they develop tumors, and he used those in his lab. So that's why he said the results mean nothing and should not be published. And that's the information that APEX was provided from the meeting it did not attend in New York in 1948. You began, I thought, I think your statement was saying that if a correct standard had been applied by the appellate court, a different result might have ensued. Given that, are you suggesting that we should send it back to the appellate court applying the standard that was established in Pudin versus the Board of Governors? As to if all of the evidence is before the court, the same standard as judgment NOB should apply to a summary judgment motion? Mr. Chief Justice, that is certainly one option this Court has. Because as I read the opinion below, while there was lip service given to clear and convincing evidence, it was not applied in the way that I believe it should be applied. But more than that, there was not a recognition of how this case fits into the overall litigation. We started off our brief, our main brief, with the nature of this litigation. The fact is that all the facts are known. All the evidence is known. They occurred between 1936 and 1951. There's no one left to provide additional evidence. So the summary judgment standard in this case, as this Court held in Pudin and in Cohen versus the Chicago Parks Department, should be looked at the same as a directed verdict standard. And I would point out that the opinion below took no issue with the decision in the Bernardo case that there was legally insufficient evidence of conspiracy for the reasons that Justice Appleton stated. And so in this unique litigation, and I'm not arguing for a change in the summary judgment standard in Illinois, because in many cases, a person should be given an opportunity to develop their case fully. But there is no further development that can be made in this litigation. And if nothing else, that's proved by the other side in saying that some evidence was left out in this particular case. And I happened to put into the record, the record index, the record of all the cases that I tried and appealed. And that evidence was there except for one very innocuous document. The evidence is concluded, so it's all there. And that's the principle that this Court recognized. My time is up, and so I yield to my colleague. Thank you, Mr. Simpson. Thank you, Justice, and may it please the Court. I'm Robert Riley, and I represent Owens, Illinois. The Fifth District made three errors of law. I should call for reversal in this de novo review. It made no reference whatsoever to the landmark holding in McClure, where my client was a defendant accused of engaging in the very same conspiracy with Owens Harding that's alleged here. The Court made no reference whatsoever to the innocent construction rule as it reviewed the plaintiff's alleged evidence. No reference whatsoever, let alone explain how, under the innocent construction rule, it could reach a conclusion opposite the conclusion that was reached in McClure. And the Fifth District made a mistake of law in suggesting that whereas here all the evidence is before the Court, that somehow the summary judgment standard is different from J&OB, food, and bowls of evidence. McClure is a landmark decision in the field of civil conspiracy, and it's built on three legal pillars. The parallel conduct rule, the clear and convincing evidence standard, and the innocent construction rule. And the Court went at great lengths in a 48-page opinion to explain why and how those rules related to each other. And the public policy supporting those rules of law to prevent the unfair application of industry-wide liability for products you didn't make based upon speculation about those. McClure applied those rules, those three pillars, to an exhaustive record about evidence concerning Owens, Illinois, and Owens Harding fiberglass. Fourteen pages of that opinion are spent recounting the evidence that supposedly proved that Owens, Illinois, and Owens Harding fiberglass conspired with J&OB. And we've given you quotations from the briefs filed to this Court in that case, specifically basing the claim on a conspiracy between Owens, Illinois, and Owens Harding fiberglass. And all this evidence was offered of our contacts, supposedly to support it. McClure painstakingly went through all of that evidence, the parallel conduct of failing to warn, the parallel use of the term non-toxic in reference to a product. All of the circumstantial evidence about sharing a published article or two published articles. In 1941, when neither Owens, Illinois, nor Owens Harding fiberglass made an asbestos-containing product, a bulk sales agreement, stock ownership that was subject from 1949 on to a consent decree where the Department of Justice controlled even how we could both stock. All to supposedly support an inference of an agreement. There's even heavy reliance on evidence that supposedly establishes our negligence. We did a study, independent of the study just referred to, an animal study. We did it alone. It's not undisputed. We didn't do it as a group. It was published. There's not even an allegation we added in anything in it. There's nothing about that, as admitted by the plaintiff's own expert, that suggests it's anything but unilateral action, and yet the court is asked to infer it was done pursuant to a conspiratorial agreement. McClure found no genuine issue of material fact. What it found was there was an issue not about negligence. This isn't a case where somebody used our product, but there was no issue with respect to agreement, and the question was not what the circumstantial evidence said. It's been around forever. It's what the legally permissible inferences that could be made from that circumstantial evidence are under the three pillars of McClure. The court said, no way, under the clear and convincing standard, no way, under the innocent construction rule, and innocent construction rule meaning is it as consistent with non-conspiratorial conduct as with alleged conspiracy. It's not whether it's laudatory conduct or whether it is or is not independent negligence, because the court said, this isn't a question of negligence, it's a question of agreement. All that evidence has been put before the court, in this case, the same evidence. The plaintiffs argue that, well, the innocent construction rule shouldn't apply here because Holmes-Owen was negligent. They should have warned. They argued that to this court 20 years ago. The court announced the innocent construction rule in that case against my client. So, unless this court's going to reverse McClure, that argument is unavailable. There is some suggestion of new evidence concerning our conduct that ended when we sold this business in 1958, more than 60 years ago. We have gone through in granular detail to discuss in our briefs how some of it isn't even evidence at all. Some of what's argued about isn't in the record at all. All of it falls into the same category of conduct, like owning stock that no court's ever held creates an influence of conspiracy. Again, the claim we had overlapping directors. We had a couple of overlapping directors last time. It ended in 1948. The plaintiff's exposure that he alleges to a cable product we didn't make started in 1969, 20 years later. And this court's asked to draw an inference that we conspired in 1969 with members of an industry that we had left a decade before, when we quit the business in 1958. The court in McClure characterized the testimony of the plaintiff's expert, Dr. Cassidy, that supposedly there was a conspiracy. He said, well, he said, I assume there was a conspiracy. This court ruled there was no foundation for that opinion, that it was based on a quote, assumption. And it was legally insufficient to support an inference of conspiracy. The plaintiffs here are simply making the same assumptions their expert made. The rule of innocent construction, the clear and convincing standard, which this court applied to my client in the face of this claim 20 years ago, those rules should dictate the same result, which is a rehearsal. And the reinstatement of the judgment in our favor by the trial court, which did follow the parallel conduct rule, the clear and convincing evidence standard, and the innocent construction rule. Thank you. Thank you. Mr. Wilder. In plaintiff's court, I'm Jim Wilder. I represent the plaintiffs, John and Deborah Jones. I'm asking the court to affirm the decision by the Fifth District that the trial court here in granting some of the judgments, and I want to address a couple of things. Justice Carmine, your question, what about Fuden? For that matter, Fuden and Cohen both stand for the premise that if all the evidence is there, then why not consider it as though it's judgmental D? In both those cases, there was no dispute that all the evidence was there, and there was no dispute that there was material fact to be considered. In Fuden, the plaintiff stood on a plea. The other side had an affidavit, and that was a question. The facts were not in dispute. The facts are in dispute in this case, and the inferences that can reasonably be drawn by a reasonable juror are in dispute. And that's why Fuden and Cohen do not apply, because here we have a dispute as to what occurred, and we have a dispute as to the significance and the inferences that a juror, a reasonable juror could draw from what did occur. I guess when I go to ABEX, ABEX spends almost all their time in the Saranac Laboratory. Most of their brief is on Saranac Laboratory and the actions. At the lower level, they even suggest that that was what was the conspiracy. Saranac was not the conspiracy for which plaintiffs seek to recover. Plaintiffs seek to recover for the conspiracy, and it's in our complaint, paragraph 19 of Calvin Law, and it's at page 30 in the record, volume 1. What we have alleged is that there was an explicit or implicit or mutual understanding among these companies to misrepresent the hazards of asbestos, to say it was non-toxic, and there was an agreement not to tell exposed people. That's a conspiracy that was alleged. That's not what the Fourth District, when they sort of flipped conspiracy law on its head, from what had occurred from Adcock back in 1994 to Redarmo in 2011. The Fourth District, in the Redarmo majority opinion in Redarmo, sort of suggested that was what the conspiracy was, the Saranac, and was even mentioned they thought it was odd it didn't match up to our complaint. Well, that's because that's not the conspiracy. Saranac is an overt act. If you're going to prevail on a conspiracy, as this court said in Adcock back in 1994, first asbestos conspiracy case where Adcock laid out the principles at pages 64 to 66, and this court in McClure basically laid them out again at pages 134, which is that if you're going to prevail, you have to show there was an agreement, and then you have to show there was a tort committed in furtherance of the agreement. We all agree we don't do anything. Then there's no conspiracy. There's no tort. And then you also can show that in addition to the tortious misconduct, there is other evidence that makes it more likely that, in fact, it was done pursuant to a common agreement because, as Adcock said, conspiracies are purposefully shrouded in mystery. Nobody gets the evidence until it's expired. They're usually proved by circumstantial evidence, inferences drawn from the evidence, and the knowledge of the common sense of how people behave. Now, as to Saranac, was there a tort that's been alleged in this case? The tort was that they knew and sold without warning. That's tortious misconduct. They intentionally exposed their employees and did not tell them without rising the hazards in the workplace. That's tortious misconduct. Those are also overt acts, and those are Acts 1 and 2 of Paragraph 20 or A and B of Paragraph 20 of our complaint. Saranac is additional activity. It's an overt act. Whether it's a tort or not a tort is not important, but it's additional evidence that shows it wasn't an accident, it wasn't happenstance, and these companies acted the same way. In fact, they had contacts. Is it based upon this meeting that was held in 1948? It's partly the meeting, Justice Garland. It's more than just the meeting. Saranac initially, and ABETS was one of the signatories, Saranac initially was, the purpose was to get some medical studies that would be a benefit fighting compensation claims. That's in the exhibits. It was run by basically the group. It was run by the chief attorney for Johns Manville, Vandiver Brown. He got 10 companies to sign on. Manville was the biggest player in the industry. It supplied to everybody else, including ABETS, and it had more than a 50% market share for most of the products. It had its own plans. Brown ran it, and he got the people to sign on and contribute money. One of them was ABETS. Saranac starts doing research. In 1943, Gardner gives him an outline. He was already overdue due to World War II. An outline saying the issue of cancer susceptibility has more significance than I first imagined. I'd like to do an additional study, but I won't include it in here. I think I'd get funding elsewhere. That went to Vandiver Brown, and he, again, it's asserted he passed on everything. Gardner dies, and in 1948, the report comes out, and it has the references to tumors, malignancies, 81.8% of one group of mice. To answer your question, Justice Gardner, that's what they excised out. They had a letter sent to the guy who headed up Saranac at that time after Gardner was dead, page 37, take out the words complications, including infections and malignancies, take out the words inmalignancies. They took out, said, we're going to take all of that out. Why did they take it out? Were they trying to protect science? Could a reasonable jurist say that's not why they were doing it? Actually, even in Redarmo, the two judge majorities said in Redarmo that it is an eminently reasonable inference that they didn't take it out for science. They did it to protect their own students. I think it was an argument from either Owens, Illinois, or ABEX that the experiment itself by Gardner was so flawed that it should not have been considered at all. Maybe I missed it. That's their argument. Is there an issue as to that? What we did not have in Redarmo, because nobody had ever went where the two-person majority went in that case, what we did not have was an expert to say, no, that has scientific validity. We have that in this case. It's Dr. Frank. They don't like Dr. Frank. He's been writing on asbestos for 40 years. They don't like his opinions on that, but he says, yes, there were flaws. Yes, there wasn't a control group, but it still had scientific importance because it signaled new growth and it signaled tumors, whether they were malignant or not. Now, they've got an expert, Dr. James Crapo, who's testified for decades on the defense side. Both have given depositions. They've not testified at trial. They've not been subject to cross-examination. That goes back to why this isn't proven. There is a dispute here. As far as the flaws, there were flaws in the experiment, but that isn't why they were taken out. They were taken out because there was still a dispute at that time about whether or not asbestos could cause cancer. This was funded by the industry. If you look at Plaintiff's Exhibit 401A, when the interim director between Gardner and Warwol told him, John's Manville attorney, we're sending this out to be reviewed by another doctor, Dr. Kenneth Lynch, who said it's valuable and publishable as it stands. The outline considers cancer. When that came to the John's Manville attorney, he responded back to the interim person saying, I don't think Gardner ever said that. Well, yeah, he did. The 43 outline. He also put a blind carbon to another Manville executive. This finding looks like it could be dynamite. And that's why it's eminently reasonable inference that that's why they were keeping it out, to save their own skin. So getting back to what we raised earlier, I said getting back to what was raised earlier, the essential question is about this 11-mice study. Is that right? And whether it was justified or not justified in removing it? In terms of additional evidence showing contact between ABEX and John's Manville, which is what's at issue in this case, that is the principal thing we're fighting about. In terms of whether ABEX, John's Manville, if I have a matter, Owens-Illinois, Owens-Corning, the fact they all knew and did not tell their employees or customers, every court has said that occurred, and they may have done it for the wrong reasons. But does that mean they had an implicit understanding or implicit scheme of what was going on? Was it just parallel conduct, or was there connections between the companies? Between ABEX and John's Manville, connections tend to show this wasn't an accident. Between ABEX and John's Manville, Saranac is such a connection. And one of the things that's true in summary judgments, unlike J&OB, when the evidence isn't complete yet, one of the things that's true is that summary judgment is not granted if reasonable minds could draw divergent inferences from the undisputed material facts, or where there is a dispute as to the material facts, summary judgment should be denied. That's what this court said in Beeman v. Friesmeier three months ago, when you received your opinion February 7th. That's always been the law. You just restated it again. Jurors can draw divergent inferences from the fact that ABEX and the other companies decided to excise. Now, as an example, the memorandum by Dr. Hanlon of ABEX, and it's sort of odd. I don't do a lot of appeals, but the main authority ABEX cites is trial courts, trial courts who follow the Redarmo paper, which was contrary to the Burgess paper. Burgess 1 and 2 of the Fourth District found, Justice Cook wrote it, the concurring justices agreed that there was evidence that ABEX had expired, direct evidence. They said that first opinion, reconsidered it after McClure, and again said that. But Hanlon's memorandum, it is what it says. They draw an inference from that that Hanlon didn't care about the stuff being published, because that would also lead to an inference. Hanlon didn't have a problem, the ABEX medical director, with the validity of the science involved. We draw an inference also, though, that Hanlon says what I'm concerned about appears to me what the managerial attorney is concerned about is repercussions from a legal point of view. And I don't want to attend if he says we should select someone. Let's select him if he can protect our interests. That's Claims Exhibit 360B. So ABEX made the choice to have another company act for them, a company that they knew was concerned about legal repercussions. So that has nothing to do with science. But those are both inferences that could be drawn by a jury. A juror could find, based on just that as an example, that that shows ABEX knew what was going on, that it was concerned about the legal effect of that coming out in a study funded by the companies. ABEX says they got a lot of summary judgments since 2011. They have. I think they say it's 126. I didn't count through them all. Maybe it is. I know this. Between Hancock and McDermott, between 1994 and 2011, that's 17 years, the amount of summary judgments they got, for that matter, OHI, at least in Central Illinois litigation, was zero. The courts found there was an issue of fact. There were divergent inferences that could be drawn. Since my time is limited, I'll turn to Owens, Illinois, and see if you have a question specific to ABEX. Yes, Owens, Illinois. Mr. Riley says, well, you've covered all this in the court. You laid out principles, summary judgment, you stated the AgCap thing, statements on conspiracy. As to what this court decided on whether Owens, Illinois was in a conspiracy with Owens Corning, which is what's an issue here because Owens Corning supplied me one of the installations that John Jones was a supply to. As to that, there was no analysis by this court in McClure. And, in fact, if you look at the OI brief, it starts off at pages one and two with what reports to be a quote from the McClure opinion. What they've done is take out, they've put in a bracketed and took out the fact that the court in McClure was referencing the issue there as to whether the defendants, OIOC, had engaged in a conspiracy with Unarco and Johns Manville because that's what those claims were, those Unarco and Johns Manville suspicions. And OI changes that to just say among the conspirators. Then the next sentence, they've got three dots. And what they leave out in those three dots is where the court says in McClure the contacts between defendants with Unarco and Johns Manville were isolated, particularly with respect to Owens-Illinois. An inference of agreement based on these contacts is not reasonable. Mr. O'Reilly says, but wait. In McClure, they spent 14 pages, exhaustive pages, going through the evidence. They laid out what the evidence was on appeal. In that 14 exhaustive pages, and they say in their brief, there's a whole section on OI and what's forming the relationship. It's three paragraphs. It's page 125. It doesn't say anything other than this was admitted, this was admitted. Then when it comes time to analyze whether Owens-Illinois and Owens-Harney were in a conspiracy, the court at page 150 says that basically that page 150 says that's tangential to our decision here. The relationship between defendants, and this is in the opinion, has little bearing on whether or not the defendants had a relationship with Unarco or Johns Manville. That's whose asbestos the McClure plaintiffs were exposed to. So there was no determination whether Owens-Illinois and Owens-Harney, given their connections, were in a conspiracy. He mentioned articles were exchanged in 1941. Owens-Illinois supplied some articles to Owens-Harney, who was a fiberglass insulation maker at the time, so that Owens-Corning could threaten the union with those. That's exhibited at 66 in 1942 because union workers wanted more money because fiberglass made the itch. Asbestos didn't make the itch. It was killed decades later. And the reason those are there are not to suggest it was conspiratorial for them to do that, but it shows they both had knowledge by 41 when Owens-Illinois supplies them that asbestos could be harmful. They both knew. Owens-Corning and Owens-Illinois knew. The workers didn't know, which is why it's a weapon, and that's the phrase in the memorandum. A weapon threatened to tell. And Owens-Illinois then goes into making payload in 43. It goes commercial in 48. And in 53, it enters into a distributorship agreement with Owens-Corning. And Owens-Illinois makes it. Owens-Corning sells it from 53 to 58. And then Owens-Illinois sells the plant to Owens-Corning. Mr. Rowley mentioned a lot of things. He didn't mention the fact that the last, the Gillenwater Court, the 4th District, the only court to consider Owens-Illinois and Owens-Corning's conduct, because Charlie Gillenwater was exposed to Owens-Corning materials, found, yeah, there was a conspiracy, at least in 53 to 58. The court below found, when I say found a conspiracy, found there was an issue for the jury to determine. The court did the same thing. In fact, every appellate court that's looked, actually looked at Owens-Illinois and Owens-Corning and said they both had knowledge, and then they agreed to market the stuff where neither one told the people who were being exposed. They marketed it and said it was non-toxic. Owens-Illinois says, well, that's, we found a committee report from 1964 from the American College of Chest Physicians that says it's non-toxic because it doesn't cause systemic poisoning. But they put that in the ads that go to union workers and contractors. It's non-toxic, easy to handle, and it shows somebody sawing the stuff without a respirator. Most of the union workers are not members of the American College of Chest Physicians or have their expertise to understand non-toxic just means no systemic poisoning. You can still get cancer and say fibrosis, which could also lead to death. What, if any, is the significance of the fact that in Gillenwater and Johnson cases that the court found that the conspiracy ended in 1958? The significance is that in the court that wasn't briefed by the parties, that's in Gillenwater. Charlie Gillenwater was exposed after 58, so that meant, oh, I was out of the conspiracy. That was the Gillenwater holding. It was a conspiracy. They started discussing that in paragraph 96 of the opinion, but then they go on to say that Gillenwater was already, oh, I was out because it withdrew. In Johnson, the majority said the same thing. In a sense, there's an issue of fact as to whether, oh, I withdrew. It wasn't making it anymore, but did they have an interest in it? And the interest was laid out in their brief, which is they had to have asbestos products to make glass. That's in the Lemieux testimony, who was CEO at the time they took their position. They had to have to make glass. They had to have batteries, and that was why they didn't start any program, asbestos control program, until the summer of 74 after OSHA. My time is almost up. I'm going to get a few more things very quickly. Going back to ABEX, ABEX says this was of benefit to us. We made money, and since that's the case, it couldn't have been in our self-interest, so we couldn't be part of a concert of action. Who joins a conspiracy to do things against their self-interest? Isn't it always a judgment that by being a conspiracy, something's good is going to come to me? So I don't see how that insulates you about being a concert of action. And in terms of both defendants, they both argue that at the summary judgment level, we're in their favor. There could be no reasonable juror that could ever find that there was a conspiracy. We cite the seven Fourth District cases that have been granted judgment of these where 84 jurors, those are just the ones that got the feel about what was going on. We ask you for your favor. Thank you, Mr. Wilder. A reply? No. Plaintiffs say Saranac is not the conspiracy. What they fail to recognize is that without Saranac, all you have is parallel conduct, and this Court held in McClure that parallel conduct is circumstantial evidence, but by itself is legally insufficient evidence. That's why Saranac is very important, and that's why the three points that I made earlier show that Saranac adds nothing to the parallel conduct. And Mr. Wilder refers to a number of exhibits that talk about Vandiver, Brown, and correspondence. You're not going to find ABEX on much of that because ABEX was throughout this time on the periphery of this research project, and there was a reason for that. Dr. Hanlon, who was the medical director, thought asbestos problems were uncommon. He said in ABEX Exhibit 159, he wrote on the subject of the hazards of asbestos and published on it. It was uncommon in his industry, and you ever note even instances of asbestosis for over 30 years at ABEX from 1930 to 1965. So he wasn't concerned about the publication of this. Dr. Frank doesn't add anything. And 70 years later, you can't fix the flaws, and Mr. Wilder says, well, they don't like Dr. Frank. Well, judges in 124 summary judgments have ruled that Dr. Frank is not adding anything to the case. Judge Martz quoted on page 20 and 21 of our reply brief shows why it adds nothing. Judge Mim in the Central District of Illinois held that it was junk science what Dr. Frank was saying and then granted us a summary judgment. As to Dr. Lynch, we put into the record the articles and on pages 246 and 255 of the appendix where he recognized the flaws that existed in Dr. Gardner's 11 mice. In fact, if you look closely at the article published in 1957, he proves that Dr. Gardner's research meant nothing. As far as the Burgess case, and I realize, Justice Norman, you were on the panel in both of the Burgess opinions. Number one, as we explain in our brief, and I won't go into this in detail, but they didn't find direct evidence. But more than that, what has been developed since the time of the Burgess opinion is all the details about the 11 mice experiment and why it absolutely means nothing. So in the final analysis, the Serenac, the decision, from ABEX's standpoint, and the only information it had at the time, just as Judge Protaska, and one reason I quote some of the circuit court judges who've made the decisions, there's some idea that they all followed Red Armable and that's all they did and they didn't have their own analysis. But there were disinterested decision makers who heard both sides and conducted their own analysis. And found that there was no basis for saying that ABEX was a participant in any conspiracy. And a lot of the evidence that we were able to bring about the details of the 11 mice experiment were not available in Burgess. It hadn't been developed and it hasn't been developed since. So for all those reasons, there is simply no evidence to support the claim against ABEX. And the evidence is complete. We're not going to have any more witnesses that tell you what ABEX knew at the time in 1948. And what we're talking about is what legal inferences can be drawn from that. And as judges across the state have held, there is no legal inference that can be drawn from the evidence that still exists that ABEX was a participant in any conspiracy. And unless the court has other questions, we ask that the court reverse the appellate court and affirm the circuit court's summary judgment. Seeing no questions, thank you. Thank you, Mr. Simpson. Mr. Riley. Thank you, Your Honor. I want to start with Mr. Wilder's suggestion that I didn't accurately cite the McClure decision at page 147 in 188 of the Illinois report. Not in the section recounting Owens-Illinois and Owens-Cornyn firing themselves, but in the section applying the three pillars to the evidence. The court says, quote, plaintiffs show that Owens-Illinois led Owens-Cornyn to published articles about the health effects of asbestos. I'm chastised because I didn't include all the other evidence referred to in the same sentence, that Owens-Cornyn received information from Johnson & Handel about its labeling decision. Owens-Cornyn sought information from other asbestos product manufacturers about their responses to the Califano announcement, and that asbestos product manufacturers held meetings in 1979 and 1983 to discuss litigation strategy, bankruptcy insurance, and the impact of the Califano announcement. The very next sentence, the mere exchange of information by manufacturers of the same or similar products is a common practice, however, and does not support an inference of agreement. That's the whole of it. It is interesting to me that in this entire argument, Mr. Wilder not one time referred to the innocent construction. Not once. Which is exactly the problem with the Fifth Circuit's decision. He did not explain to this court how consistent with the clear convincing evidence statement and the innocent construction rule, you could take a sales agreement, which is silent on the subject of what can or can't be said about asbestos or studies or anything else, not a word in there, and draw an inference because if we had a bold sales agreement that we were in a conspiracy with the purchaser. No explanation for that. No explanation for how parallel conduct in terms of how one's Illinois or how one's going to characterize the product could be an inference permissible under the three pillars of McClure of conspiracy when we gave the court the evidence that the EPA and the published literature showed it was commonly understood that the word non-toxic in that era in 1950 didn't apply. It was properly applied to asbestos. We didn't offer it to prove we weren't negligent. We offered to prove the innocent construction of parallel conduct, which is exactly what was before the court in McClure. That evidence was in here. That evidence of the 53 sales agreement was there. This has been litigated. And Mr. Wilder even suggested the basic tenet of the conspiracy is none of these people warned their own employees. We did. The testimony of Richard Grimmie is in this record. He says he was warned about asbestos hazards when he came to work for OI in the payload division. As the manager of the plant, he warned every employee, provided respirators, provided an x-ray program. On this record, Mr. Wilder didn't even bother to offer any rebuttal to that. And yet he asked this court to infer from the fact that we did warn our own employees, that we were in a conspiracy not to warn our employees. There is no there there. This court has considered this evidence, properly ruled we were entitled to judgment under the three pillars of the McClure decision. We ask that the court issue that ruling again. Thank you very much. Thank you. Case numbers 123-895 and 124-002, Jones v. Abex in Owens, Illinois, will be taken under advisement as agenda number six. Mr. Simpson, Mr. Riley, Mr. Wilder, we thank you for your arguments this morning. Marshall, the court will take them.